**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**           **CRIMINAL ACTION**

**VERSUS**                                               **NO. 19-204**

**TERRAN WILLIAMS, TYRONE BOVIA,**
**JAVONTA DOLEMAN**                          **SECTION "H"**

## ORDER AND REASONS

Before the Court are Defendant Terran Williams's Motion for Acquittal
and New Trial (Doc. 1677); Defendant Javonta Doleman's Motion for Acquittal
and New Trial (Doc. 1676); and Defendant Tyrone Bovia's Motion for Acquittal
and New Trial (Doc. 1683). For the following reasons, the Motions are
**DENIED**.

## BACKGROUND

This matter arose out of gang activity by a criminal organization known
as the "Byrd Gang" out of the Magnolia projects in the Third Ward of New
Orleans, Louisiana, between January 2014 and August 2021. Twenty-one
defendants were initially charged, and only Terran Williams, Javonta
Doleman, and Tyrone Bovia remained for trial (hereinafter, "Defendants").
Each of the remaining three Defendants was charged with a Racketeer

1

Influenced and Corrupt Organizations Act ("RICO") conspiracy, a drug trafficking conspiracy, a firearms conspiracy, murder in aid of racketeering, and causing death through the use of a firearm. The RICO charge listed 50 overt acts, including instances of drug distribution, firearm possession, arrests, shootings, and murders. Defendants were charged in the January 31, 2017 murders of Wynston Jackson and Lawrence Williams, IV outside of an Edna Karr high school basketball game ("the Edna Karr murders").

A two-week trial was held from March 31 to April 15, 2025. The Government presented testimony of law enforcement agents and co-conspirators, including Byrd Gang members Ernest Thomas and Briyan Love and drug supplier Roy Lee, as well as evidence from Defendants' own social media accounts, photographs, and phone records. Through this evidence, the Government established that the Byrd Gang was a violent drug-trafficking organization operating out of the Magnolia Projects that used violence to intimidate and silence their rivals, specifically the Ghost Gang out of the Calliope Housing Projects. After deliberating for nearly two days, the jury returned a verdict of guilty as to all Defendants on: Count 1, which charged Defendants with conspiracy to violate federal racketeering laws; Count 2, which charged Defendants with conspiracy to distribute a kilogram or more of heroin, and quantities of fentanyl, cocaine base, and marijuana; Count 3, which charged Defendants with conspiracy to possess firearms in furtherance of a drug trafficking crime; Count 4, which charged defendants with the murder of Wynston Jackson in aid of racketeering; and Count 6, which charged Defendants with the murder of Lawrence William, IV in aid of racketeering. Defendant Tyrone Bovia was also found guilty of Count 8, which charged him

with aggravated assault in aid of racketeering, and Count 9, which charged him with discharging a firearm during and in relation to a crime of violence and a drug trafficking crime.[1] Defendants were found not guilty of Counts 5 and 7, which charged them with causing the death through the use of a firearm of Wynston Jackson and Lawrence Williams, IV, respectively.

Now before the Court are Defendants' post-conviction motions. Defendants each move separately for acquittal and a new trial. The Government filed an omnibus opposition. The Court will address each of Defendants' arguments in turn.

## LEGAL STANDARD

### A. Acquittal

Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may move for a "judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2] To this end, the court must "review the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict."[3] The court is "concerned only with whether the jury made a

---

[1] Additionally, Doleman was convicted in case number 24-243 of possession with intent to distribute marijuana; possession of a firearm in furtherance of a drug trafficking crime; and possession of a firearm by a felon. He does not present any arguments for acquittal or new trial on these convictions.

[2] Jackson v. Virginia, 443 U.S. 307, 319 (1979).

[3] United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008) (citation modified).

rational decision, not whether its verdict was correct on the issue of guilt or innocence."[4]

## B. <u>Motion for New Trial</u>

Federal Rule of Criminal Procedure 33(a) states, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[5] The Fifth Circuit has held "the trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict. A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."[6] The movant bears the burden of demonstrating that a new trial is justified.[7]

## <u>LAW AND ANALYSIS</u>

### A. <u>Motion for Acquittal</u>

The Court will consider each of Defendants' arguments for acquittal in turn.

#### 1. *Javonta Doleman*

Doleman moves for acquittal of all of the charges of which he was convicted. However, he does not argue with specificity why he should be acquitted on any particular count. Rather, in one brief paragraph he argues generally that "the vast bulk of the evidence had nothing to do with" him.[8] Because the Government was tasked with proving a RICO conspiracy, there

---

[4] *Id.* (citation modified).
[5] FED. R. CRIM. P. 33.
[6] United States v. Wall, 389 F.3d 457, 466 (5th Cir. 2004).
[7] United States v. Soto-Silva, 129 F.3d 340, 343 (5th Cir. 1997).
[8] Doc. 1676.

was certainly evidence that did not directly pertain to Doleman. However, the fact that Doleman was not implicated in every transaction of the organization does not mean that there was not sufficient evidence to convict him. Indeed, the Government presented sufficient evidence that Doleman was a gunman for the organization, including the testimony of Ernest Thomas, Briyan Love, and Taray Butler. Thomas testified that Doleman sold marijuana and that he witnessed Doleman receive heroin from Tim Jackson, the Byrd Gang's leader. The Government introduced several arrests in which Doleman was found to be in possession of or in proximity to firearms and drugs and in the company of other alleged members of the Byrd Gang. The Government also introduced excerpts from Doleman's own X account, which showed him in possession of firearms, displaying the hand sign associated with Byrd Gang, and interacting with members of the Byrd Gang. Doleman's phone download also contained evidence of drug trafficking and illegal firearms. Love testified, and her phone records confirmed, that she communicated with Doleman before and after the Edna Karr murders. She testified that Williams admitted to her that Doleman had taken part in the murders. Butler testified that Doleman admitted to him that he had shot Wynston Jackson. Given the foregoing and without more specific argument from Defendant supporting acquittal, the Court finds that

there was sufficient evidence to sustain a conviction against Doleman on all counts.

### 2. *Williams and Bovia*

Defendants Williams and Bovia each separately move for acquittal on certain charges of which they were convicted. The Court will consider each count and their arguments thereto in turn.

#### i. *Count 1*

Count 1 charged Defendants with conspiracy to engage in racketeering activities. A guilty verdict on this charge required the Government to prove that two or more people agreed to commit a substantive RICO offense; and that the defendant knew of and agreed to the overall objective of the RICO offense. No Defendant has argued that the Government did not prove the existence of a RICO conspiracy. The Government established that the Byrd Gang was a criminal organization engaged in drug trafficking that used violence and intimidation to accomplish its goals. Only Bovia contends that there was insufficient evidence presented at trial to connect him to the RICO conspiracy. Much of the arguments Bovia puts forth for acquittal, however, raise issues not appropriately considered on a motion for acquittal, such as the credibility of witnesses and the prejudice of certain evidence.[9] Further, he argues that the case against him was built entirely on guilt by association. The Court disagrees.

"It is not enough for defendants to argue that they were less implicated than other defendants. Once the government presents evidence of a conspiracy,

---

[9] United States v. Robertson, 110 F.3d 1113, 1117 (5th Cir. 1997) (stating that a trial judge has no discretion to weigh evidence or assess credibility on a motion for a judgment of acquittal).

it only needs to produce slight evidence to connect an individual to the conspiracy."[10] "The agreement can be proven by circumstantial evidence alone, but cannot be lightly inferred."[11] "A defendant can be convicted of conspiracy even if he only participated at one level . . . and only played a minor role."[12]

The Government presented evidence that Bovia was a gunman and low-level dealer for the Byrd Gang organization. Roy Lee, the organization's main distributor, testified that he met Bovia through one of his drug customers and that Bovia had visited Lee's stash house on more than one occasion. Thomas testified that Bovia was a gunman for the organization, that he was around Jackson when Jackson sold heroin, and that Bovia personally distributed marijuana. He testified that Tim Jackson bailed Bovia out of jail after an arrest. The Government introduced pictures and videos of Bovia possessing firearms and posing with other members of the Byrd Gang. Bovia's own phone revealed firearm possession and drug trafficking activities with other members of the Byrd Gang. Video footage and testimony implicated Bovia in the shooting of a rival gang member with other members of the organization. Finally, Love testified that Bovia admitted to her that he shot Wynston Jackson, a prominent member of the rival Ghost Gang. Accordingly, there was much more than "slight evidence" presented at trial to connect Bovia with the Byrd Gang and its RICO conspiracy.

ii.    *Count 2*

Count 2 charges Defendants with conspiring to possess with the intent to distribute a kilogram or more of heroin, and quantities of fentanyl, cocaine

---

[10] United States v. Perry, 35 F.4th 293, 320 (5th Cir. 2022) (citation modified).
[11] United States v. McClaren, 13 F.4th 386, 402 (5th Cir. 2021)
[12] *Id.*

base, and marijuana. To convict Defendants on these charges, the Government had to prove beyond a reasonable doubt (1) that two or more persons, directly or indirectly, reached an agreement to possess with the intent to distribute a controlled substance, that is heroin, fentanyl, cocaine base, or marijuana; (2) that the defendant knew of the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose. Williams and Bovia each argue that there was insufficient evidence presented at trial to convict them on this count.

Williams and Bovia argue that the evidence presented at trial does not support their convictions on a heroin conspiracy.[13] They argue that Lee, Thomas, and Love each testified that they never saw Williams or Bovia selling heroin.[14] But the Fifth Circuit has "recognized that there are many different roles that participants in a drug conspiracy may play, for example: supervisor and manager, distributor, collector, courier, gunman and enforcer, and firearms procurer and storer."[15] Roy Lee's testimony established the overall scope of the Byrd Gang's drug trafficking operation, and there was copious evidence that Williams and Bovia were engaged in the Byrd Gang's conspiracy to sell drugs as gunmen. Both Thomas and Love testified that Williams and Bovia served as gunmen for the group, and photographs, social media, and cell phone evidence confirmed that they were regularly in possession of firearms and traded and sold firearms amongst other members of the group. Both were

---

[13] The jury found that Bovia conspired to distribute a quantity of heroin, fentanyl, cocaine base, and marijuana, but did not find any quantity of heroin attributable to him. The jury found that Williams conspired to distribute a quantity of heroin, fentanyl, cocaine base, and marijuana, and found only a quantity of heroin attributable to him.

[14] In fact, Thomas testified that Williams "sold heroin a few times." Doc. 1754-2 at 229.

[15] United States v. Cole, 423 F. App'x 452, 458 (5th Cir. 2011).

arrested in possession of drugs and firearms on multiple occasions. For example, law enforcement testified that Williams was involved in an attempted traffic stop in which he and other members of the Byrd Gang fled, leaving behind phones, IDs, firearms, and marijuana and fentanyl packaged for distribution. Thomas testified that the gunmen in the organization were tasked with protecting other members of the group, especially its wheelchair-bound leader and main source of supply Tim Jackson, and carrying out acts of violence against opposing groups. Thomas implicated Williams in three shootings with other members of the Byrd Gang, including the murder of Kenneth Diggs at the direction of Tim Jackson. As discussed later in this opinion, both Williams and Bovia were implicated in the murder of Wynston Jackson, a prominent member of the rival Ghost Gang. Accordingly, there was sufficient evidence presented at trial that a rational jury could find that Williams and Bovia joined in the conspiracy to distribute drugs as gunmen.

### iii.    Counts 4 and 6

Counts 4 and 6 charged Defendants with the murders in aid of racketeering of Wynston Jackson and of Lawrence William, IV, respectively. To prove these charges, the Government was required to show beyond a reasonable doubt: (1) that the enterprise existed as alleged in the Second Superseding Indictment; (2) that the enterprise was engaged in interstate commerce or that its activities affected interstate commerce; (3) that the enterprise was engaged in racketeering activity; (4) that the defendant committed Second Degree Murder; and (5) that the defendant's purpose in committing the crime of violence was to gain entrance to, or to maintain, or to

9

increase his position in the enterprise. Both Bovia and Williams move for acquittal on these charges.

Williams argues that the Government failed to prove the fourth and fifth elements. He argues that the Government failed to prove beyond a reasonable doubt that he was a principal to murder because of deficiencies in the investigation, including lost surveillance evidence of the night of the shooting and a lack of forensic evidence connecting Defendants to the murders. In addition, Williams argues that law enforcement failed to investigate other potential perpetrators who had committed murders around the same time and were linked to Love. He also argues that the Government failed to present any evidence that his involvement in the murders was for the purpose of advancing his position in the Byrd Gang. Similarly, Bovia emphasizes the lack of forensic or ballistic evidence, cell site data, or eyewitness testimony linking him to the murders.

This Court finds that there was sufficient evidence presented at trial for a rational jury to convict Williams and Bovia on these crimes. "The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."[16] Thomas testified that he was at the park with Defendants when Williams received a message from Love stating that the victims were at the Edna Karr basketball game. Thomas testified that Defendants left the park by car to go to the basketball game with the intention to kill the victims. Love testified, and her phone records corroborated, that she communicated with

---

[16] United States v. Terrell, 700 F.3d 755, 760 (5th Cir. 2012).

Williams and Doleman before and after the murders. She testified that she told Williams that the victims were at the basketball game and that Williams asked her to find out if the victims were dead after the shooting. Love testified that Williams admitted to her the next day that he, Doleman, and Bovia had gone to Edna Karr and that he and Bovia had shot at the victims while they sat in their car. She testified that Bovia later admitted the same to her. Thomas testified that he spoke to all three of Defendants after the murders about their involvement in it. A surveillance video of the shooting and ballistics confirmed there were three shooters. Taray Butler testified that Bovia complained that Williams was bragging about the murders and that Doleman admitted his involvement in it to him. A download of Bovia's phone revealed several news site searches for the murders immediately after they occurred. It also revealed Bovia's attempts to trade a weapon of the same make as one used in the shooting within 48 hours thereof. The jury heard testimony that Bovia called his weapon a "ghostbuster" and tweeted "GG Founder," suggesting that he was involved in the murder of Wynston Jackson, a.k.a. "Baby Ghost."

As to the fifth factor, Thomas testified that members of the Byrd Gang were expected to commit violent crimes and that certain rivals, like Wynston Jackson, were "bigger troph[ies]" or targets for these violent acts. Love and Thomas testified that Wynston Jackson was a target because of his association with the Ghost Gang. Testimony and social media evidence revealed that Defendants bragged about their involvement in the murders after they occurred. Accordingly, "there was sufficient evidence for the jury to make the reasonable inference that the murder was committed in furtherance of the

11

charged conspiracies."[17] The Court finds that the Government presented sufficient evidence at trial for a rational jury to convict Williams and Bovia of Counts 4 and 6.[18]

Further, Defendants were also charged with aiding and abetting Counts 4 and 6. In order to be found guilty on that theory, the Government need only have shown (1) that the offense of committing a violent crime in aid of racketeering as charged in Counts 4 or 6 was committed by some person; (2) that the defendant associated with the criminal venture; (3) that the defendant purposefully participated in the criminal venture; and (4) that the defendant sought by action to make that venture successful. Neither Williams nor Bovia presents any argument that the Government failed to make this showing. Indeed, all of the evidence previously outlined supports a finding that Williams and Bovia were at a minimum involved in the Edna Karr murders. Accordingly, Defendants have not shown they are entitled to acquittal on any charge.

## B. <u>Motion for New Trial</u>

Each of the three Defendants moves for a new trial on several different grounds. Williams and Bovia argue that they should receive a new trial because of the prejudicial impact of the admission of the "My Team Winning"

---

[17] United States v. Perry, 35 F.4th 293, 321 (5th Cir. 2022).

[18] Defendants also suggest that because they were found Not Guilty of Counts 5 and 7, which charged them with causing death through use of a firearm, the jury did not believe the Government's theory of the case that Defendants were the shooters in the Edna Karr murders. Even assuming the jury's verdict was inconsistent, it is well-settled that guilty verdicts are not subject to attack on inconsistency grounds. United States v. White, 972 F.2d 590, 595 (5th Cir. 1992). "In the event of inconsistent verdicts, . . . it is just as likely that the jury, convinced of guilt, properly reached its conclusion on [one count], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [related] offense." Bravo-Fernandez v. United States, 580 U.S. 5, 13 (2016) (citation modified).

music video. Williams separately moves for a new trial in light of the lack of credibility of the Government's witnesses. Doleman moves for a new trial on the grounds that Bovia's counsel created prejudice by improperly soliciting testimony from Government witnesses. And each Defendant argues that the Court erred in failing to sever his trial. The Court will consider each argument in turn.

### 1. *"My Team Winning" Rap Video*

Williams and Bovia argue that the admission of the entirety of the "My Team Winning" music video over their objections violated Fifth Circuit precedent and was so prejudicial as to warrant a new trial. The "My Team Winning" music video features a rap song performed by Tokey Hefner and Yungstackz, well-known local rappers and members of the Byrd Gang. All three Defendants are featured at various points in the video. The lyrics of the song include profanity and references to violent acts, murders, and firearms. The performers point firearms—both real and hand gestures—at the camera and make other obscene and violent gestures throughout the video.

In his Motion, Bovia thoroughly details the chain of events leading the Court to ultimately admit the entirety of the "My Team Winning" video.[19] The Court allowed the video to be admitted by the Government as relevant and probative to Defendants' association with the Byrd Gang and the organization's use of music to promote the organization and threaten and intimidate rivals. The Court ultimately allowed admission of the video and audio in its entirety, with a limiting instruction, after counsel for Doleman moved for such under the rule of completeness, arguing that he was only briefly

---

[19] Doc. 1683.

13

featured in the context of the entire video. The Court found that the probative value of the video outweighed its prejudice.[20] The Court read a limiting instruction to the jurors in conjunction with the video's admission and in the final jury charge, cautioning that it was not being offered to prove the truth of any specific crime mentioned by the performers and that they should not allow any personal distaste for rap music to prejudice Defendants.

Bovia and Williams reassert their pre-trial argument that the video should not have been admitted because it does not satisfy the Fifth Circuit's standard for the admissibility of rap music. They also argue that the video was not properly authenticated and that the lyrics were offered for their truth, contrary to the Government's pre-trial assertion otherwise. Defendants chiefly argue, however, that the violent and profane nature of the lyrics and hand gestures made by the performers of "My Team Winning" were so prejudicial under Federal Rule of Evidence 403 as to warrant a new trial.

This Court has already held that the standard articulated by the Fifth Circuit in *United States v. Sims* for the admissibility of rap music does not apply here where the music was not introduced for the truth of the lyrics.[21] The

---

[20] Defendants contend that the Court initially ruled otherwise. In discussing the Government's efforts to introduce several rap music videos, the Court observed generally that "there are many portions of the videos and the lyrics in which the Court finds that the prejudice outweighs the probative value. The lyrics are often violent, sexual, misogynistic, and expletive-filled, and may refer to criminal activity not at issue in this case." Doc. 1387. That said, the Court went on to identify specific songs, such as "Man Down" and "Kingg Tokyo F*ck Sh*t," in which the lyrics were overly prejudicial. The Court did not make this finding as to "My Team Winning." The Court initially ordered the Government to pare down the introduction of "My Team Winning" to portions that were relevant and probative. However, after Doleman moved for admission of the entirety of the video under the rule of completeness, the Court granted his request. In so holding, the Court recognized that the lyrics of the "My Team Winning" video were not overly prejudicial.

[21] United States v. Sims, 11 F.4th 315, 323 (5th Cir. 2021); *Perry*, 35 F.4th at 326–27; Doc. 1387.

video was properly authenticated by Thomas, who was familiar with the song, the lyrics, the performers, the method by which the video was produced, and personally appeared in the video.[22] And further, the Court does not agree that the Government sought to prove the truth of the "My Team Winning" lyrics. While it is true that the Government went through some of the lyrics and their meaning with Thomas, they did so only to show that the lyrics bragged about violent acts and firearm possession and referenced individuals that Thomas knew to be associated with the Byrd Gang. The Government did not seek to show that any particular violent act referenced in the song actually occurred.

As to the prejudice of the video, the Court finds Defendants' views of its prejudice overstated. Rule 403 provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "Rule 403's major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[23] While the video contained violent language and images, they were not unlike those posted to Defendants' own social media accounts and presented at trial. For example, Bovia posted to his X account: "if they ion got ah couple bodies they Can't Even Roll With Us"; "No them chest shots aint shit im tryna hit his brain!"; and "Trigger Happy We Shoot N****z."[24] Both men regularly posted images of themselves with firearms. Surely appearing in a music video where a rapper performs violent and obscene lyrics and gestures

---

[22] Federal Rule of Evidence 901(a) "merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." Nester v. Textron, Inc., 888 F.3d 151, 160 (5th Cir. 2018). This Court had previously held that the video should be introduced by "a witness with personal knowledge of the lyrics and why, how, and when the song was produced." Doc. 1387. Thomas met this qualification.

[23] *Sims*, 11 F.4th at 323.

[24] Ex. 177.

is not more prejudicial than posting violent and obscene statements and images to one's personal social media page. Further, Williams, for his part, was only briefly featured riding a dirt bike at the beginning of the music video before any lyrics began, and therefore, it is unlikely that any undue prejudice from the video was associated with him. The Court finds that the probative value of the "My Team Winning" video outweighed any slight prejudice that may have resulted from its admission.

Finally, the Court twice gave a limiting instruction to the jury regarding the concerns of prejudice argued by Defendants.[25] The Fifth Circuit has "consistently held that an erroneous admission of evidence may be cured by such a limiting instruction because jurors are presumed to follow the court's instructions."[26] Defendants have not adequately explained why the Court's limiting instruction did not protect them from undue prejudice.[27] Accordingly, the admission of the "My Team Winning" video does not warrant a new trial.

### 2. *Witness Credibility*

Williams argues that he should be granted a new trial because the Government's witnesses, specifically Love and Thomas, displayed an overall lack of credibility throughout the trial, including inconsistent testimony and

---

[25] The limiting instruction was given just prior to the introduction of rap music video evidence and again in the jury charges given at the conclusion of trial. At the conclusion of trial, the Court instructed the jury that "[c]ertain rap music videos and clips were offered into evidence. Those videos were not offered to prove the truth of any specific crime mentioned by any of the performers. You should not allow any personal distaste for the music genre to prejudice you against the defendants in any way. The defendants are cloaked in a presumption of innocent unless and until the government proves their guilt beyond a reasonable doubt and you should not convict them merely because they may have appeared in a music video or because the lyrics and images in those videos may have been of a violent or criminal nature."

[26] United States v. Paul, 142 F.3d 836, 844 (5th Cir. 1998).

[27] *Perry*, 35 F.4th at 344.

bias. These credibility issues were thoroughly and rigorously addressed on cross-examination. Defendants introduced the fact that both Love and Thomas used drugs during the period in question; that they had prior convictions; that they each had friction with one of Defendants over a shared romantic partner; that their stories regarding the night of the Edna Karr murders have changed over the years; and that they had previously lied to law enforcement. Williams argues that the witnesses' lack of credibility prevented the Government from proving his guilt beyond a reasonable doubt and necessitates a new trial.

> The Fifth Circuit has held that:

> Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature. Where the defense has had an opportunity to question witnesses as to their biases, and the jury has concluded that the witnesses are credible, the trial court has broad discretion in ruling on a motion for a new trial.[28]

Here, Defendant thoroughly explored Love and Thomas's biases and credibility issues before the jury. Even taking those factors into consideration, this Court does not find that the evidence "preponderates heavily against the verdict" as to present a "miscarriage of justice to let the verdict stand."[29] Love's and Thomas's testimonies were corroborated by other evidence, as discussed at

---

[28] United States v. Thompson, 945 F.3d 340, 347 (5th Cir. 2019).
[29] *Wall*, 389 F.3d at 466.

length earlier in this opinion. Accordingly, this Court does not find that a new trial is warranted based on witness credibility or bias.

### 3. Summary Testimony

Doleman devotes 12 of the 14 pages of his post-trial motion to his argument that he is entitled to a new trial because he was prejudiced by improper FBI agent testimony solicited by Bovia's counsel. Doleman's Motion exhaustively and correctly lays out the course of events that took place during trial regarding this issue, and this Court need not repeat it in its entirety here.[30] In short, Bovia's counsel repeatedly toed the line and flouted this Court's pre-trial limine ruling prohibiting the introduction of summary, overview testimony during her cross-examinations of law enforcement agents.[31] While the situation was troubling—and frankly mystifying—the end result is that this Court's "careful monitoring of the testimony" prevented the introduction of improper summary testimony before any harm was done.[32] Doleman does not identify any overview or summary testimony that was solicited to his prejudice.[33] The record is clear that the Court prevented Bovia's counsel from suborning improper summary and opinion testimony from law

---

[30] Doc. 1676.

[31] In reliance on Fifth Circuit precedent, this Court held that it would "not permit witnesses to summarize live testimony, give testimony akin to a closing argument, or backdoor 'highly inculpatory hearsay via an explaining-the-investigation rationale.'" Doc. 1382 (quoting United States v. Fullwood, 342 F.3d 409, 414 (5th Cir. 2003); United States v. Sharp, 6 F.4th 573, 582 (5th Cir. 2021)).

[32] *Perry*, 35 F.4th at 327.

[33] Doleman only expressly references a single exchange in which Bovia's counsel asked Special Agent Beau Barker whether "it would have been important to run down all the leads in this case," and he responded "No, not when I have people that are inside the Byrd Gang that were involved in that event telling me that they have, that they know that Terran Williams, Tyrone Bovia, and Javonta Doleman did that, then, no." Doc. 1676. The Court denied Doleman's tardy objection to this question at trial and held that, notwithstanding Barker's answer, Bovia's counsel's question did not seek opinion or summary testimony.

18

enforcement, and therefore Doleman was not harmed by her repeated attempts to do so. Accordingly, Doleman's deep, personal frustration with a co-defendant's counsel is not grounds for a new trial.

### 4. Severance

Each Defendant has separately argued that the Court erred in failing to grant a severance of his trial. Federal Rule of Criminal Procedure 14 gives the district court discretion to grant a severance "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant or the government."  "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[34] It is well settled that defendants are not entitled to severance merely because they might have a better chance of acquittal in separate trials."[35] "There is a preference in the federal system for joint trials of defendants who are indicted together" because joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."[36]

Williams argues that Doleman's defense strategy was antagonistic to his own when he asked for the entirety of the "My Team Winning" to be played to the jury over Williams's and Bovia's objections. He also argues that Doleman sought to show that he did not associate with the Byrd Gang, whereas Williams argued that his association with the members of the Byrd Gang did not indicate he was involved in the criminal enterprise. Similarly, Bovia argues that

---

[34] Zafiro v. United States, 506 U.S. 534, 540 (1993).
[35] *Id.* at 539.
[36] *Id.* at 537.

19

Doleman is the only defendant that conceded that the Byrd Gang was a criminal enterprise, while Bovia argued that there was no singular Byrd Gang.

As explained above, the admission of the "My Team Winning" video did not "rise to the level of substantial prejudice."[37] Further, each of Defendants' arguments amounts to differences in trial strategy and is not grounds for a severance. For example, Doleman's counsel felt the best strategy would be to admit the "My Team Winning" video in its entirety so that the jury saw how seldom Doleman appeared in it. Williams, who appeared less in the video than Doleman, did not agree with this strategy in light of the perceived prejudice of the song's lyrics. That said, severance is not mandated simply because co-defendants have different strategies or defenses.[38]

> To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other. Such compelling prejudice does not arise where the conflict concerns only minor or peripheral matters which are not at the core of the defense.[39]

Here, the core of Defendants' defenses was not mutually exclusive or irreconcilable. Even assuming the jury accepted Doleman's concession that the Byrd Gang was a criminal organization, they could still have believed that none of Defendants were associated therewith or that none of Defendants agreed to participate in the organization's criminal activities.

Doleman, for his part, puts forth a different argument for severance, again relying on his dispute with Bovia's counsel regarding the introduction of

---

[37] *Perry*, 35 F.4th at 327.
[38] *Zafiro*, 506 U.S. at 538.
[39] United States v. Romanello, 726 F.2d 173, 177 (5th Cir. 1984).

20

summary evidence from law enforcement witnesses. He argues that his co-defendant's repeated attempts, over the Court's warnings and sustained objections, to solicit testimony that had already been ruled inadmissible prejudiced him and compromised a specific trial right—namely, his right not to be tried by summary law enforcement evidence. He also argues that he was prejudiced by his counsel's repeated objections to a co-defendant's questions in front of the jury. As discussed above, however, this Court succeeded in preventing Bovia's counsel for soliciting summary law enforcement testimony to the prejudice of the other defendants. And Doleman does not cite to any law suggesting that the poor optics of objecting to a co-defendant's questions are sufficient to warrant a severance of trial. Indeed, "[g]eneric allegations of prejudice will not suffice" to warrant a severance.[40] Accordingly, there were no grounds for severance, and the Court did not err in denying those requests.

## CONCLUSION

For the foregoing reasons, the Motions are **DENIED**.

New Orleans, Louisiana this 15th day of July, 2026.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[40] United States v. Ledezma-Cepeda, 894 F.3d 686, 690 (5th Cir. 2018).